## DONIPHAN LUMBER COMPANY *v.* HENDERSON.

### Opinion delivered July 10, 1911.

1.  WATERS—USE OF NAVIGABLE STREAM—NEGLIGENCE.—A lumber company using a navigable stream for the purpose of floating logs must exercise ordinary care to avoid injuring others who rightfully use the river for purposes of navigation.   (Page 60.)

2.  SAME—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—Where plaintiff's intestate was killed by a jam of logs belonging to defendant in a navigable river striking and sinking the ferry boat in which he was crossing the river, evidence tending to prove that defendant could have prevented the injury by notifying the ferryman of the approach of the logs is sufficient to sustain a finding that defendant was negligent. (Page 60.)

3.  SAME—CONTRIBUTORY NEGLIGENCE.—Though plaintiff's intestate knew that the river which he undertook to cross was swollen and rising, and that logs were accustomed to being floated down, and though the ferryman objected to crossing and advised intestate to wait until morning, the question whether intestate was negligent in attempting to cross the river in a ferry boat was for the jury.   (Page 61.)

4.  NEGLIGENCE—QUESTION FOR JURY WHEN.—Where there is uncertainty as to the existence of either negligence or contributory negligence, the question is one of fact for the jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men may honestly draw different conclusions from them.   (Page 61.)

5.  WATERS—NEGLIGENCE—PROXIMATE CAUSE.—Where defendant had placed great quantities of logs in a navigable stream, and knew that they would come down in large bodies during a high rise, and that ferries were operated across the river, the question whether the defendant's negligence in floating its logs unattended and without warning to others was the proximate cause of the drowning of plaintiff's intestate while being ferried across the river was for the jury.   (Page 62.)

Appeal from Cleburne Circuit Court; *Brice B. Hudgins,* Judge; affirmed.

STATEMENT BY THE COURT.

This is the second hearing of this case on appeal. The first appeal was from the judgment sustaining a general demurrer to the complaint, and is reported in 94 Ark. 370 (*Henderson v. Doniphan Lbr. Co.*).

The suit was brought by the administratrix for damages for the wrongful death of her husband and intestate, alleged to have been caused by the negligence of the lumber company. The negligence complained of was that the lumber company cut and put into Little Red River loose saw logs, and negligently allowed them to accumulate in jams and float down the river unattended and without warning to others rightfully using the river, and that upon a sudden rise the logs came down in great bodies or jams, striking the ferry boat upon which Vinson Henderson, the intestate, was crossing the river, and sinking it, thereby drowning him.

The answer admitted that the logs were cut and put in the river for the purpose of being floated to the mill; denied that there was any negligence in putting them into the stream, that it negligently permitted them to accumulate in jams, and that said Vinson Henderson lost his life by reason of any negligent act upon its part; and pleaded contributory negligence of the deceased in bar of the action.

The testimony shows that it was the custom and practice of the company to have its logs cut and thrown loose into the Little Red River for 50 miles above the ferry where the injury occurred; that these logs, so placed in the river, would be brought down upon its rising to a sufficient height to carry them, floating along unattended except by drivers along the shore, whose duty it was to keep them from lodging against the bank, and caught in a boom near the mill below the ferry; that the logs were put in for several months at a time before a rise of sufficient height would come to carry them out; that during some of the rises they would float down the river and sometimes lodge and jam in large numbers on shoals or "towheads," and remain until a larger or higher rise would come and take them out.

The injury occurred at Faulkner's ferry on the 29th day of November, 1908. William Faulkner was the ferryman who attempted to put the deceased across in his boat. He had been operating the ferry at this place for 13 years, and lived about

200 yards from the bank of the river. He had been away during this day, and his son Elmer put the deceased and his daughter across the river, and, upon the ferryman's return late in the afternoon, he and his wife and two little boys walked down to look at the river and see about the boat. The river had been rising since the day before, and had risen six feet "plumb water" to this time. While he was there, Henderson signaled from the south bank to be put across. Faulkner took his little son Clyde, and ran the boat to the other side, and took Henderson and his team on. The boat is operated across the river on a cable. There is a pulley or wheel that runs the cable with a chain about three and one-half feet in length, which is attached to the staple about the middle of the boat to hold it, and the ferryman and his assistants pull on the cable to move it across. After taking the team on, they swung the boat 'round, and the current was so strong it tore the cable out of their hands. The ferryman then took an oar and pulled to the bank and back up to the cable. He told the deceased that it was dangerous to cross and tried to prevail upon him to go with him to his son's or the house of another person on that side of the river and stay all night, and said he would put him across in the morning. He told him that he was not afraid of the river, but that he was sick and preferred to wait for his son Elmer. To this Henderson replied that he must get home that night; that there was no real danger, and that he would help him operate the boat. They started again, and he told Henderson to attach the chain in the pulley or ring to the staple. This Henderson tried to do, and he said, "I cannot hook it. I can hook the other." Faulkner said: "Don't do that," but he hooked it. "He hooked it in the chain that I tied the boat to the bank with."

The ferryman described the occurrence as follows: "We were all three pulling, and all three of us had hold of the cable on the upper end. Mr. Henderson was in front, I think, the boy next, and I was behind. We were out something near half way on the river when the jam struck us. There is a bend in the river, and you cannot see up the river until you get about middle ways. It struck with such force that as soon as it struck it pushed us away from the cable, but we had the boat chained to the cable and it went the length of the chain. As soon as it did that, the jam of logs upset the boat on the edge, and

there were so many logs in the jam that it could not turn over. I went to the back end and got my son. Mr. Henderson got on his mare. The logs were coming in such a jam that they would have to tear loose against the edge here, and this chain was all that was holding the jam. Henderson came to my back and clinched me, and I told him to turn loose and catch hold of the banister of the boat. I told him the boat was going to turn over, and it might come with a jerk. There was such a press of logs that it eased over, and I said, "Climb up on them them." We would have been to the bank in a few minutes, but the logs came in such a mass it weighted it right down and pushed us off the boat. We couldn't stay there. We all three grabbed the same two logs, and we were all three between the same two logs, and the jam pushed us on, and we went right on, and went two miles until we struck the jam on Briar below. The current took us right to it, and he (Henderson) went down. I never could see him any more. He was drowned under that jam of logs. I don't know how many logs were in that jam. They were from one brush to the other, a solid jam from bank to bank; the logs came there until the jam got so far I couldn't hear them hit. The jam we landed on was on Briar below us. The logs that turned the boat over were passing us all the time. We couldn't get out from them. The water was cold and chilled me. When I got to the bank, I could not walk. While we were in the water, Henderson said he was getting numb. He was a good Christian man and prosperous.

"I am acquainted with the purposes for which Little Red River is used, and I have been for several years. It was customary to float logs in rafts until the Doniphan people put them in loose. I knew before the accident of that custom, and that a rise would send a great quantity of logs down the river. The Doniphan Lumber Company had been using the river to float logs down loose for two years or more prior to the accident. I was aware of the fact that the logs would come down if there was a sudden rise. I knew they had been putting in logs all season. I knew that they had logs up there, but I did not know there was a head rise going to bring them all at once. The head rise comes altogether. There was a twenty-foot rise. I don't know how long it took to rise that

twenty-foot rise.   It was still rising next morning.   The river did not rise all at once twelve or fourteen feet.

"The Doniphan Lumber Company had a camping crew at my place that morning.   They had been there a day or two rolling in logs.   I knew they came from the upper river above the ferry.   They were there just before the accident, rolling logs into the river.   I knew that was their business.   They were rolling in logs that had caught on the bushes, so that the rise would take them off.   I do not know whether any logs had been running that day or not.   There was one once in a while when I was coming.   None struck the boat when we were going after Henderson.   From my experience I knew the logs put in the river above me would come down on the first big rise.   In the spring of 1908 my ferry stood there three and one-half days right in planting time on account of these logs running so thick I could not ferry, and the year before I lost three and one-half days."

Answering the question, "When Mr. Henderson came down there and wanted to cross the river, did you try to get him to go back there and stay all night with Mr. Albert Stanley and not undertake to cross that night, and didn't you tell him it was dangerous to do it?"   He said:

"Gentlemen of the jury, I will tell you just what I said to him.   After we went over, and we started, and the boat jerked loose; I was sick; I wasn't well; I said: 'Henderson, let's go to John's or Sarah Jane's, one, and stay until morning.' He said, 'I have to get home.'   I said: 'Wait until Elmer comes home to help me.'   He said: 'We just had a bad miscue in turning.   I can pull it across myself.'   I told him: 'Let's go back to Elgin Graham's or John Staley's,' after the boat got loose the first time.   John Staley lived 2½ miles from the river. The river was not dangerous to cross on account of being up."

The testimony showed that Pangburn, ferryman, quit operating his boat above the Faulkner ferry about noon, and that the ferryman below the Faulkner ferry three miles quit operating his boat on account of the rising river and floating logs about 3 o'clock.   There was some testimony tending to show that the logs were running freely along at noon when the camping crew at this ferry were sent word to go on down to the

boom to catch the logs; that the river was almost half full of logs at that time. The ferryman testified, however, that there was only an occasional log coming down when they crossed to get Mr. Henderson, and his little son, that not more than two or three at a time were coming, and none struck the boat.

It was also shown that Mr. Vinson Henderson, the deceased, lived about a mile and a half from the river and had lived there about all his life; that he had worked on it a little ten or twelve years before and put in a few logs and run them to Judsonia. His daughter testified:

"My father, Margie Crook and myself, crossed the river November 29, 1908. I was fourteen years old that day. I saw some logs in the river as we went across. I don't know how many I saw—just two or three together. They had to push two or three off the boat. We crossed the river about 2 o'clock. The river was up, but was not anything like past ferrying. I have seen it crossed when it was two feet higher. There was nothing said about it being dangerous. I do not know anything about the ferry, because I was not used to the river. The logs were not scattered clear across the river. I do not know how many times they had to push them off. I believe it was twice. They were running very fast. Mr. Elmer Faulkner ferried us across the river. I saw a good many logs as we crossed, but did not take time to count them."

Mrs. Margie Crook testified: "I saw logs floating on the river. I reckon there was about a dozen in sight when we were at the ferry. They didn't all come down at once. The river was up some, but was not dangerous. We started and got part of the way across the river. There were some logs, maybe two or three on the upper side of us, and they might have held the boat until these passed. There were no logs pushed the boat that I saw at all."

Mr. J. E. Hicks testified: "On November 29, 1908, Mr. Boggs at Clay 'phoned me to know where these men were working at on the water. I told him they were at Faulkner ferry. He asked me if I could deliver a message for him. Then he told me to go down there and tell Ed. Cochran to take his men and go to the boom as quick as possible; that the river was rising pretty fast, and the logs were coming free. I went and delivered the message. They left just as they got through

with their dinner.   They were right at the ferry.   They went in a boat down the river.   I found them on the north bank of Faulkner ferry, and the logs were running pretty thick at 11 o'clock.   The river was running swift and rising.   The logs were coming so thick at that time it would have been a risky piece of business to undertake to cross the river in a ferry boat.   They continued to come as long as I was there in such quantities as I would call it dangerous at that time.   The men got in their boat and went on down.   They dodged in and out among the logs with their little boat which was not very large.   The logs were moving pretty swift, and I do not know whether any of them struck their boat.   They would have sunk or busted it if they had hit it.   There is a bend in the river at the ferry.   When the river is at the ten-foot stage, it would be a five-foot rise.   You would have to be one-third of the way from the south bank before you could see logs coming down the river going from the south bank to the north bank.   There is a curve in the bank, and timber leaning over the bank prevents you from seeing up the river."

There was much testimony introduced tending to show contradictory statements made by the ferryman and wife about the occurrence.

There was testimony introduced showing the age, life expectancy and earning capacity of deceased; also his ability for and inclination to proper education and training of his children.

The court instructed the jury, which returned a verdict in favor of the administratrix, and from the judgment thereon this appeal comes.

*S. Brundidge, Jr.,* and *Harry Neelly,* for appellant.

The proof does not show any negligence on the part of appellant.   94 Ark. 370; 69 Ark. 402; 28 S. W. 416; 14 S. W. 775.   Deceased was guilty of contributory negligence.   81 Ala. 234; 16 S. E. 457; 76 Ark. 13; 81 Ark. 1; 87 Ark. 576; 61 Ark. 549; 54 Ark. 431.

*J. N. Rachels, Chas. E. Robinson* and *M. E. Vinson,* for appellee.   *R. B. Robinson,* of counsel.

Appellant was guilty of gross negligence.   Deceased was not guilty of contributory negligence.   94 Ark. 253; 93 Ark.

18; 88 Ark. 231; *Id.* 484; *Id.* 524; *Id.* 183; 85 Ark. 326; 79 Ark. 241; 78 Ark. 22; *Id.* 355; 76 Ark. 227.

KIRBY, J., (after stating the facts). It is contended that the court should have directed a verdict for the appellant, because it was not shown to have been guilty of any negligence in the use of the river in floating its timber. On the former appeal, we said:

"The Little Red River is a navigable stream, used mainly for floating logs. Defendant (appellant now) and others have the right to use it for that purpose, even without rafting the logs; but in doing so they must exercise ordinary care to avoid injuring others who rightfully use the river for the purposes of navigation. Those who use the river must take notice of defendant's use in floating logs in the usual way, and must exercise care to avoid contact with the logs. The question whether defendant made use of the stream in a careful manner —that is to say, free from negligence under the circumstances of the case—and whether the injured party exercised care under the circumstances for his own safety, are questions for a jury to pass on." *Henderson* v. *Doniphan Lbr. Co.*, 94 Ark. 374.

The jury could have found, under the instructions given by the court and from the testimony, that, if the ferryman had been informed that a head rise was coming which would probably bring out all the logs above, he would not have undertaken to cross the river at the time he did; that the lumber company knew of the fact and sent word to its crew of men at the ferry about noon on that day, advising that the river was still rising; that the logs were coming free, and directing them to go immediately to the boom and take care of catching them upon arrival. It was further testified that if some one had been stationed at the ferry or immediately above it by the mill company, it could have given notice to the ferryman and others rightfully using the river, whose rights were of equal dignity with those of the lumber company, of the approach of the logs, and thus have prevented the injury. This being true, we are of the opinion, upon the whole case, that the mill company did not exercise such ordinary care as a reasonably prudent man would have used in its operations upon the river and bring-

ing its timber to the mill at the time, and the jury were warranted in finding it negligent.

It is next contended that there was such contributory negligence shown upon the part of the deceased as will prevent a recovery as a matter of law. It is true that the ferryman had been engaged in the operation of the ferry for thirteen years at this place; that he was familiar with the custom of the lumber company in cutting and floating its timber; that he knew the river above was full of logs that would come out upon a big head rise, and that he had had to quit the operation of his ferry for three days the year before and two days the year before that, on account of the rising river and floating logs, and that he knew the danger of attempting to cross when the logs were coming down in any considerable number. It was also shown that the deceased lived 4 miles from the ferry and within a mile and a half of the river, and knew the custom of floating logs upon it; but he had safely crossed the river about 2 o'clock that afternoon with his daughter and another young lady, and at that time only a few logs were floating down, as many as two or three together, but none struck the boat, and it had to be held for only one small batch to pass. It is also true that the river was still rising, and it was about dark at the time he attempted to cross last, and they could not see up the river on account of the bend, but no considerable quantity of logs were floating and passing at the time the ferryman took the boat over for him, nor were any seen to be coming at the time they attempted to return with him, and it did not take a great while to cross. It is also true the ferryman objected to crossing and advised that they would better stay on that side of the river until morning, assuring deceased that there would be no expense to him in so doing, but he put it upon the ground that it was because he was sick and not able to pull the boat over.

We are of the opinion that, under all the circumstances, it was a question for the jury as to whether or not he was guilty of such contributory negligence in attempting to cross at the time and in the way he did as would bar his recovery.

The jury might have found that the logs had not soon before the injury been floating in such large numbers as would make it obviously dangerous to cross the river, so much so that a reasonably prudent man would not have undertaken it at

the time and under the conditions surrounding the deceased at the time he attempted to cross, and the question of his negligence was one for the jury to determine. The rule was approved by this court in *St. Louis, I. M. & S. Ry. Co.* v. *Hitt,* 76 Ark. 231, as stated in *Richmond & D. Rd. Co.* v. *Powers,* 149 U. S. 43, where the court said:

"It is well settled that where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair minded men will honestly draw different conclusions from them."

We are not able to say that the undisputed facts in this case relative to the conduct of the deceased were such that reasonable men might not differ as to whether he did exercise ordinary care under the circumstances, and that in reason and fairness only one conclusion could be drawn from them, and the court cannot declare that he was guilty of negligence as a matter of law. *St. Louis, I. M. & S. Ry. Co.* v. *Hitt,* 76 Ark. 231; *St. Louis, I. M. & S. Ry. Co.* v. *Martin,* 61 Ark. 555; *St. Louis & S. F. Rd. Co.* v. *Carr,* 94 Ark. 253.

The question of whether the appellant's negligence was the proximate cause of the injury was also one for the jury, and they might have found that it was the natural and probable consequence thereof and ought to have been foreseen in the light of the attending circumstances. Appellant knew that great quantities of logs had been placed in the river loose; that they would come down in large bodies during a high rise, filling the river from bank to bank and in the swift current, with force almost irresistible, sweeping everything out of the way with which they came in contact; that ferries were operated across the river upon which the people passed to and fro; and it was a question for the jury to decide whether the accident and injury was the natural and probable consequence of floating its logs unattended and without warning to others in the rightful use of the river, and ought to have been foreseen in the light of existing circumstances. *St. Louis, I. M. & S. Ry. Co.* v. *Bragg,* 69 Ark. 402; *Pulaski Gas Light Co.* v. *McClintock,* 97 Ark. 576.

No objections to the instructions given and refused are urged here, and on the whole case we do not find any prejudicial error shown by the record, and the judgment is affirmed.